[No. C041749. Third Dist. Nov. 19, 2004.]

CENTRAL DELTA WATER AGENCY et al., Plaintiffs and Appellants, v. STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents;
DELTA WETLANDS PROPERTIES et al., Real Parties in Interest and Respondents.

250

**COUNSEL**

Nomellini, Grilli & McDaniel, Dante John Nomellini, Daniel A. McDaniel, Dante John Nomellini, Jr.; and Thomas M. Zuckerman for Plaintiffs and Appellants Central Delta Water Agency et al.

Michael F. McGrew, Neumiller & Beardslee, Thomas J. Shephard, Sr., Daniel J. Schroeder, and DeeAnne Watkins for Plaintiffs and Appellants San Joaquin County et al.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Clifford T. Lee and Mark W. Poole, Deputy Attorneys General, for Defendants and Respondents.

Ellison, Schneider & Harris, Anne J. Schneider, Jason M. Miller, Peter J. Kiel, Barbara A. Brenner; Herum, Crabtree & Brown and Steven A. Herum for Real Parties in Interest and Respondents.

## OPINION

**BLEASE, Acting P. J.**—This action challenges the decision of the defendant State Water Resources Control Board (Board or Water Board) that issued permits for the appropriation of water for the Delta Wetlands Project (Project) and certified a final environmental impact report (EIR). (State Wat. Resources Bd. Dec. No. 1643 (Feb. 15, 2001) [2001 WL 1880741] (hereafter Decision).)[1]

Proponents of the Project and real parties in interest are Delta Wetlands Properties, Delta Wetlands, and KLMLP, L.P., hereinafter referred to as DW. The Project involves the diversion of water from the San Francisco Bay/Sacramento-San Joaquin Delta Estuary (Delta) into reservoirs to be constructed on two islands in the Delta for later rediversion and sale to potential purchasers in amounts as yet unknown.

Notwithstanding the uncertain nature of the use, the Water Board approved the permits, stating that a "potential exists for the DW Project water to be beneficially used because the existing demand for water in California is not met in most years." The permits do not specify the users or the quantity of water to be sold and the Decision states only that the Project could be economically feasible. Rather, these matters are made the subject of conditions attached to the permits. "The permits for the Project will require that it be adequately designed, impacts will be mitigated, and a market for its water supply exists so that it can continue to operate for the expected life of the project."

To this end the permits limit the amounts to be diverted from the Delta for storage and prohibit the filling of the reservoirs above mean sea level until DW has contracted for the purchase of the water, specified the use and place of use for each contract of sale, demonstrated that the water reliably can be wheeled,[2] and obtained a determination from the Chief, Division of Water Rights that the water will be used beneficially. The permits define beneficial use generally as "Domestic, Irrigation, Municipal, Industrial, and Fish and Wildlife" and the service area as the "Central Valley Project Service Area (CVP), State Water Project Service Area (SWP), and Bay-Delta Estuary," an

---

[1] The term "Decision" includes the order that contains conditions for the permits.

[2] "Wheeling" refers to the use of another's conveyance facility to transport water to the end user. (*Metropolitan Water Dist. of Southern California v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1407 [96 Cal.Rptr.2d 314].)

area encompassing much of the state. (Wat. Code, §§ 1254, 1257.)[3] The Board's California Environmental Quality Act (CEQA) determination does not evaluate the environmental consequences of the potential uses of the appropriated water because they are speculative.

Appellants, a water district, several reclamation districts, owners of islands adjacent to the reservoir islands, a county and a county flood control district, challenged the Board's decision on the grounds inter alia that the Board erred in issuing permits to appropriate water for storage and sale without purchasers and hence without investigating the amounts, nature, impacts of and beneficial use of any water which is sold. All but the appellants settled their claims before issuance of the permits.

■ We conclude that under the state Constitution and the Water Code an application for a permit to impound water in a reservoir must state, and the Water Board must determine, that an actual, intended beneficial use, in estimated amounts, will be made of the impounded waters. A general statement of potential beneficial use is insufficient and the Board may not satisfy its statutory and constitutional obligations by conditioning a permit on a particular use and in amounts to be specified at some later date. We also conclude the CEQA requires that the Water Board evaluate and condition the permits to mitigate the environmental consequences of the specific intended beneficial use of the impounded water before issuance of a permit.

We shall reverse the judgment and order the trial court to set aside the permits and direct the Board to require that DW amend the applications to specify an actual use of and the amounts of water to be appropriated consistent with the requirements of the Water Code and the implementing regulations. Before issuing revised permits, the Board shall evaluate the use or uses specified by an amended application, determine whether they are beneficial and whether the amounts to be used can be reliably wheeled and are reasonably required for the beneficial use specified. In all other respects we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Project Overview*

DW applied to appropriate water from channels flowing through the Delta. It plans to construct reservoirs on two islands, Bacon Island and Webb Tract, for the impoundment of the water. It also plans to construct wildlife habitats on two other islands, Bouldin Island and Holland Tract, to mitigate the

---

[3] References to a section are to the Water Code unless otherwise indicated.

wildlife and wetland impacts of the Project. The Project plans call for diverting water from the Delta into the reservoirs during periods of high water by using two intake siphon stations on each island. The impounded water would be discharged into the Delta at a pumping station on each island. DW also plans to divert water to the habitat islands under a claim of riparian rights and senior appropriative water rights.

DW plans to redivert the water discharged from the reservoirs at pumping plants operated in the Delta by the SWP,[4] the CVP,[5] or the Contra Costa Canal intake to be conveyed by means of unused conveyance capacity to be secured from the CVP or SWP, for sale to as yet unknown purchasers or for use to meet Delta water quality and flow objectives. DW's applications state the places of use will be the area of the SWP and the CVP south and west of the Delta, and the Delta, an area which encompasses a large portion of the State of California. The purposes of the use are stated as irrigation, domestic, municipal, industrial, fish and wildlife preservation and enhancement, and the improvement of water quality.

## B. *History of Administrative Proceedings*

The initial applications to appropriate water were filed in 1987.[6] As originally envisioned, the Project would have used all four of the affected Delta islands for water storage. The United States Army Corps of Engineers (USACE) and the Water Board, as co-lead agencies, drafted and circulated a joint EIR/EIS (environmental impact report/statement) on the Project in 1990. After substantial public comment, DW reconfigured the Project, reducing the number of reservoirs from four to two.

The Water Board and USACE, as co-lead agencies, prepared and circulated a draft EIR/EIS for the revised Project in 1995. The Water Board noticed a hearing on the water rights applications to be held in July 1997. The Water

---

[4] The SWP is a water storage and delivery system authorized by state statute consisting of dams, reservoirs, power and pumping plants, operated by the Department of Water Resources (DWR). SWP water flows from the Feather and Sacramento Rivers to the Delta, from which it is pumped into the California Aqueduct and conveyed south for irrigation and domestic use. DWR, as authorized by statute, has entered into contracts to supply water to agricultural and urban water contractors throughout the state. (*Goodman v. County of Riverside* (1983) 140 Cal.App.3d 900, 903 [190 Cal.Rptr. 7]; *Planning and Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 898–899 [100 Cal.Rptr.2d 173].)

[5] The CVP is a system of dams, aqueducts, and canals operated by the United States Bureau of Reclamation (USBR) which provides irrigation water to farmers in the central valley from the San Joaquin and Sacramento rivers and their tributaries. (Littleworth and Garner, Cal. Water (1995) p. 237.)

[6] The applications were numbered 29061, 29062, 29063, 29066, 30267, 30268, 30269 and 30270.

Board received testimony over the course of 12 days in July and August of 1997. In November 1998, the Water Board requested additional information from DW.

A revised draft EIR/EIS was prepared and circulated in 2000. The Water Board resumed the water rights hearing for three more days in October 2000. It adopted the Decision approving the Project at its meeting on February 15, 2001.

### C. *Protests*

Initially, there were a number of protests of the Project. The primary issues raised in the 1997 hearing were the amount and effect of dissolved organic carbon compounds produced in the Project reservoirs, levee stability and seepage into the Delta, and impacts on fish in the Delta. The protesting parties generally fell into the following groups: (1) existing entities in the Delta, including the appellants herein, which primarily addressed levee stability, seepage, and salinity issues; (2) Pacific Gas and Electric (PG&E), which addressed impacts to its facilities on Bacon Island; (3) municipal water users, including California Urban Water Agencies (CUWA), Contra Costa Water District (CCWD), East Bay Municipal Utilities District (EBMUD), Diablo Water District, and the City of Stockton, which addressed water quality, levee stability and public interest issues; (4) exporters of water from the southern Delta, including DWR, USBR, and the State Water Contractors (SWC), which addressed water quality and wheeling issues and water rights priorities; fish and wildlife protection interests, including the Department of Fish and Game (DFG), Bay Institute of San Francisco, the California Sportfishing Protection Alliance, the Committee to Save the Mokelumne, and Peter Margiotta; (6) Amador County, which addressed area-of-origin protections; and (7) the California Department of Transportation (CALTRANS), which addressed state highway rights of way.

By the time the year 2000 hearing was held, the only parties presenting additional evidence that had not also entered into settlement agreements with DW were PG&E and appellants. Some parties maintained their protests but did not present additional evidence. Appellants presented additional evidence regarding fishery protection, an issue not raised in this appeal.

### D. *Settlement Agreements*

Amador County and DW entered into an agreement during the 1997 hearing to include a provision in DW's permits and licenses making its rights junior in priority to any permit or license issued for water for use in Amador County. The City of Stockton entered into a similar agreement with DW.

The North Delta Water Agency and DW entered into an agreement that the Water Board add language to any permit or license that would prohibit DW from operating the reservoir islands if water quality standards relating to salinity are not met. DW and DWR entered into an agreement to include permit terms prohibiting diversion of water to or discharge from the reservoirs if it would adversely affect the operation of the CVP or the SWP. The Water Board agreed to accept these terms, and found they were sufficiently similar to the agreement between DW and USBR to protect both USBR and DWR.

Shortly before the 2000 hearing dates, DW executed agreements with EBMUD, CCWD, and CUWA. They require DW to operate the Project in accordance with the Delta Wetlands Water Quality Management Plan, to limit diversions under specified conditions, to coordinate Project operations with the operations of the CVP, SWP and CALFED,[7] and to address fishery protection on the Mokelumne River, levee stability and seepage control.

DW and DFG also resolved certain issues raised during the 1997 hearing regarding the DFG Biological opinion through litigation and negotiations.

The Board's decision noted DW had resolved numerous issues through agreements on the terms and conditions of the permits. The Water Board concluded the unresolved issues concerning the effects of the project on other water rights holders, on neighboring islands, on the state highway, and on PG&E's gas lines would be mitigated through additional terms and conditions on the operation of the Project.

E. *Permit Conditions*

The Water Board determined that problems of seepage and levee stability had to be mitigated to protect neighboring islands. It determined that DW's seepage mitigation plan, involving a system of interceptor wells placed through the levees of the reservoir islands, would adequately mitigate the effect of seepage. To ensure the success of the seepage mitigation plan, the Water Board conditioned the permits on the approval of all agencies having jurisdiction over the system, and on the design and approval of the system by a licensed professional engineer, qualified in the design of Delta levees and seepage control systems in an estuary.

The Water Board found that DW planned to strengthen the levees by widening and raising the existing levees using fill material excavated from

---

[7] CALFED is an agreement among San Francisco Bay and Delta-related state and federal agencies whose purpose is the development of a long-term comprehensive plan to restore the ecological health and improve water management for beneficial uses of the Bay-Delta system. (§§ 78500.2, 78684–78684.13.)

the islands. The Water Board found the levee construction could temporarily increase the risk of levee failure and required that a licensed professional engineer design and approve the design of the levees. The Water Board also noted that if the levee was designed to hold water four feet or more above mean sea level, the structure was subject to review and regulation by the Department of Safety of Dams (DSOD). Condition 12 of the Decision provided that "[n]o construction shall be commenced and no water shall be diverted under this permit until all necessary federal, state and local approvals have been obtained."

PG&E owns two subsurface high-pressure gas transmission pipelines that cross Bacon Island, although only one is currently in operation. The permits contain numerous conditions to mitigate any harm to the PG&E pipelines.

Of the numerous protestants, only appellants have challenged the Board's decision. They are the Central Delta Water Agency, San Joaquin County Flood Control and Water Conservation District; Reclamation Districts 2027, 2024, 2038, 2059, and 2072, the County of San Joaquin, CCRC Farms LLC, and Palm Tract Farms.

The Central Delta Water Agency encompasses approximately 120,000 acres in the Delta. The reclamation districts are located in the Delta. CCRC Farms LLC is a limited liability company that conducts farming operations on Mandeville Island, which is adjacent to Webb Tract and Bacon islands in the Delta. Palm Tract Farms is a partnership that farms and manages habitat on Palm Tract, which is adjacent to Bacon island in the Delta.

Appellants' issues on appeal fall roughly into two categories, CEQA and non-CEQA issues. We shall address the non-CEQA issues first.

· I

Water Code Requirements

A. *The Board's Evaluation of the Water's Intended Use*

The heart of this case is the Board's failure to require the permittee to specify the actual uses, amounts and places of use of the impounded water before issuing the permits. Its entire statement on the matter, which appears in the Decision under the heading, Beneficial Use, is as follows.

"5.1 Beneficial Use of the Water

"Beneficial use is a necessary element of a water right. (§ 1240.) Factors in determining whether water will be beneficially used include the cost of the water and the demand for new water supplies. If demand exists and different water supplies are available to buyers, the cost of the water will influence whether it will be beneficially used. DW has presented no evidence that it has any buyers for the project water. Unless someone buys the water or the project, there will be no beneficial use of the water. The potential exists for the DW Project water to be beneficially used because the existing demand for water in California is not met in most years. In addition, CALFED has expressed interest in in-Delta water storage, for both fishery benefits and enhanced water project flexibility. [Citations.]

"The settlement agreements between DW and CCWD, and between DW and CUWA, improve the chances that DW will be able to sell water to suppliers of municipal water. The most likely customers for the water or water rights of the Delta Wetlands Project are DWR or USBR, or a municipal water supply contractor of one of these projects. DW presented evidence that DWR and the USBR are considering whether to buy the project to enhance their operations in the Delta. [Citations.]

"The cost of the DW Project water will be a major factor in selling either the water or the project. In 1997, DW estimated the cost of water at $200 to $300 per acre-foot plus conveyance charges and costs due to mitigation and operational limitations. [Citations.] In 2000, DW presented evidence that the water could be marketed if (1) the cost were kept in the range of other comparable projects, that is, within a range of $260 to $700 per acre-foot, and (2) DW or a buyer of the DW Project could produce water for sale in this range. [Citations.] At the price DW estimates, agricultural water users are unlikely to buy water from the project. [Citation.]

"The USBR estimates that if it buys the project and constructs it at a combined cost of $348 million, the USBR can produce water at a cost of $209 per acre-foot of water, with an annual operation and maintenance cost of $6 million and an average water supply yield of 142,000 acre-feet per year. In a test of sensitivity of the costs and water supply capability, the USBR increased construction and operation and maintenance costs and reduced the average annual water supply by 25% which resulted in an average cost per acre foot of $336 and a yield of 110,000 acre-feet. [Citation.]

"To ensure that any water diverted to storage for the DW Project is used beneficially, the permits will be conditioned to require a buyer or buyers of the water or water rights to be identified before the reservoirs are filled above mean sea level. [Citation.]"

The permits issued by the Water Board authorize the water to be used for several purposes, identified only by the general categories "Domestic, Irrigation, Municipal, Industrial, and Fish and Wildlife," within the "Central Valley Project Service Area, State Water Project Service Area, and Bay-Delta Estuary . . . ."

### B. *The Constitution and the Water Code*

Appellants argue that the Board violated the Water Code by failing to investigate and evaluate the uses to which the appropriated water would be put before issuing the permits. They reason that because no actual purchasers for the Project water were identified, the Board could not have analyzed the nature and impact of any specific use of the impounded water as required by the Water Code. We agree.

■ In the law of water rights two principles regarding the right to use water predominate. First, the right to use water is limited to the amount reasonably required for the beneficial use to be served. Second, the right to use water does not extend to waste or unreasonable use or method of use or diversion. These principles are set forth in the state Constitution and are the basic policy of the Water Code.

■ The state Constitution provides that the right to water or to use water is limited to such water as is "reasonably required for the beneficial use to be served," and does not extend to "the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (Cal. Const., art X, § 2; see *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1242 [99 Cal.Rptr.2d 294, 5 P.3d 853]; *Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140–141 [60 Cal.Rptr. 377, 429 P.2d 889].)[8] The Water Code replicates these provisions in stating that "[t]he right

---

[8] California Constitution, article X, section 2 states: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is

to water . . . in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (§ 100.)[9]

■ The Water Code governs the exclusive means by which a right to appropriate water subject to appropriation may be acquired.[10] It requires that the applicant set forth and the Board determine the beneficial purpose, place of use, amount of use and method of use to which the appropriated water will be put. The application must contain, inter alia, "(c) The nature and amount of the proposed use[,] [¶] . . . [¶] (f) The place where it is intended to use the water" (§ 1260) and, with respect to the storage of water in a reservoir, "the use to be made of the impounded waters . . . ." (§ 1266). The application must set forth information appropriate to the use specified. (See e.g., §§ 1262 [agricultural],[11] 1264 [municipal water supply];[12] see also Cal. Code Regs., tit. 23, §§ 659–670, 696.) It must contain maps, drawings and other data required by the Board. The map must show "the place of use, and any other features necessary for ready identification and understanding of the project." (Cal. Code Regs., tit. 23, § 715.)

■ The Water Board's decision in issuing a permit must track the matter required to be in the application. "As prerequisite to the issuance of a permit to appropriate water the following facts must exist: [¶] . . . [¶] (b) The application must contain the matter and information prescribed by this division [and] (c) The intended use must be beneficial." (§ 1375; see also § 1240.) Upon receipt of an application the Board must give notice of "[t]he use to be made" and "[t]he location of the place of use" of the water. (§ 1301, subds. (h), (i).)

■ Other sections bear upon the Board's obligations. The permit must specify the times for beginning and completing construction and application of the water to beneficial uses. (§§ 1395–1398.) An applicant "may change the point of diversion, place of use, or purpose of use from that specified in

---

lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

[9] Section 275 directs that the Water Board and DWR take appropriate action to prevent waste and the unreasonable use of water.

[10] "[N]o right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance with the provisions of this division." (§ 1225.) The "division" is division 2 of the Water Code, containing sections 1000 to 5975.

[11] In applications for the appropriation of water to be used for agricultural purposes, the applicant must state the legal subdivisions and acreage to be irrigated. (§ 1262.)

[12] In applications for the appropriation of water to be used for a municipal water supply, the application must state the present population to be served and the future requirements of the city. (§ 1264.)

the application . . . but such change may be made only upon permission of the board." (§ 1701.) A change may be made only if the Board finds the "change will not operate to the injury of any legal user of the water involved." (§ 1702.) "The issuance of a permit gives the right to take and use water only to the extent and for the purpose allowed in the permit" (§ 1381) and the use must conform to "that specified in the permit . . . ." (§ 1610.5.) Finally, a license may be issued "which confirms the right to the appropriation of such an amount of water as has been determined to have been applied to beneficial use." (§ 1610.)

In fulfilling its statutory obligations under the Water Code the Water Board "pursues at the same time those broad policy expressions and directives contained in article XIV, section 3, of the Constitution . . . ." (*Bank of America v. State Water Resources Control Board* (1974) 42 Cal.App.3d 198, 206–207 [116 Cal.Rptr. 770].) The purpose of the Water Code requirements is to enable the Board to carry out its duty to determine "the estimated amount which can be put to beneficial use including reasonable conveyance losses . . . ." (Cal. Code Regs., tit. 23, § 696.)[13]

A statement of alternative potential beneficial uses fails to meet these requirements. Since the DW applications fail to set forth the actual use or uses of the impounded water, it was not possible for the Board to estimate the reasonable amount of water that could be put to any specific beneficial use. The Board attempted to delegate its authority to the Chief of the Division of Water Rights to determine these matters after the permits were issued and the Project constructed by a condition attached to the permits,[14] but the authority is not delegable. Although the Board may employ personnel to assist it (§ 186), it may not delegate the authority to determine the merits of an application for a permit to appropriate water, except as provided by statute. With one exception the statutory authority to issue a permit for the appropriation of water is conferred on the Board. (§§ 179, 1250, 1350; see *Bank of America v. State Water Resources Control Board, supra*, 42 Cal.App.3d at

---

[13] Section 697 of the regulations sets forth criteria for determining the amounts of water considered reasonably necessary for specified beneficial purposes.

"The amount of water for which to apply is governed by the estimated amount which can be put to beneficial use including reasonable conveyance losses, and shall be stated in the definite terms of some established unit of measurement, such as cubic feet per second, gallons per minute or per day, or acre-feet per annum." (Cal. Code Regs., tit. 23, § 696.) The regulations provide criteria by which to determine the amount of water considered reasonably necessary for irrigation and domestic use. (Cal. Code Regs., tit. 23, § 697.)

[14] Condition 21 of the Board's Decision provides: "Prior to filling the DW Project reservoirs above mean sea level, Permittee shall provide the Chief, Division of Water Rights, copies of water service contracts with at least one entity to whom water will be delivered under this permit. For each contract, Permittee shall specify the purposes of use, delineate the place of use, and specify the quantities of water to be used so that the Chief can determine that the water will be placed to beneficial use."

pp. 206–207.)[15] As noted, section 1375 requires, as a "prerequisite to the issuance of a permit," that specified facts "must exist," including "the matter and information prescribed by this division . . . ." By contrast, the Water Code provides that the Division of Water Rights may make determinations on the merits of "minor protested applications." (§§ 1345, 1347.)[16] A minor application is one that "does not involve direct diversions in excess of three cubic-feet per second or storage in excess of 200 acre-feet per year." (§ 1348.).

■ The Water Board argues that "[t]he Water Code does not require that each and every end user be identified before a public interest determination can be made."[17] The argument is made in opposition to appellants' claim the Decision does not support the public interest as required by section 1253.[18] Although section 1253 gives the Water Board broad authority to condition a permit to meet the purposes served by the public interest, it does so within the procedural and substantive confines of the Water Code and the state Constitution. The Water Board cannot ignore the detailed statutory and regulatory requirements it must meet in issuing a permit to appropriate water and cannot satisfy a duty imposed on it by the state Constitution and the Water Code in issuing a permit by placing it in a condition to a permit.

■ There is nothing in the public interest provisions of section 1253 that conflicts with the requirements of the Water Code. It authorizes the "appropriation for beneficial purposes of unappropriated water under such terms and conditions as in its judgment will best develop, conserve, and utilize" the water to be appropriated. Although the term "beneficial use" refers to the purpose to which the water to be appropriated will be put, when the phrase "appropriation for beneficial purposes" is used it means, in keeping with the policies of the state Constitution and the Water Code, the amount of water that is "reasonably required for the beneficial use to be

---

[15] Nothing we say here concerns the authority of the Board to delegate to its staff matters relating to procedure. (§§ 7, 186.)

[16] Consistent with these provisions, SWRCB Resolution No. 99-031 (1999) [1999 WL 33512257] delegation No. 3.2 delegates the authority of the Board to the Chief of the Division of Water Rights, to issue new permits, "when no protests are outstanding" (delegation No. 3.2.12) and "after Board decision or order" (delegation No. 3.2.17).

[17] It is true that if the water is sold to (say) a water district, the district's individual customers need not be specifically identified. But the district itself must be identified along with the amount of water it plans to use for the beneficial purposes of its customers.

[18] Section 1253 provides: "The board shall allow the appropriation for beneficial purposes of unappropriated water under such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water sought to be appropriated." (§ 1253; see also §§ 1240, 1255, 1256.)

served . . . ." (§ 100.) It presupposes an actual appropriation of a specified and reasonable amount of water for use for a beneficial purpose at a designated place.

Nor can the Water Board satisfy its responsibility on the basis that since there is a general shortage of water in California, all of the water impounded in the DW reservoirs could be put to beneficial use by someone for any of the beneficial purposes listed in the Decision. As noted, the statutes speak of actual, not potential uses. A contract or contracts for the sale of the impounded water to one or more of possible users of the water need not involve the use of all of the water that is available for appropriation and diversion from the Delta to the reservoirs or may involve an unreasonable use or means of use. If a choice of use is at issue the Board is enjoined to "consider the relative benefit to be derived from . . . all beneficial uses" to which the water might be put. (§ 1257.) Lastly, in allowing the service area to be specified as the area served by the CVP and the SWP, the Board has done little more than say the water should be used in California.

There is precedent for these views in decisions of the Water Board. In State Water Resources Control Board Decision No. 1422 (Apr. 4, 1973) [1973 WL 19662], involving the New Melones dam, an integrated part of the Central Valley Project, the Board restricted the amount of water that could be impounded in the dam because the USBR could not specify a present beneficial use for all of the water the dam could hold. The Board said: "[T]he specific intended use must be evaluated and found to be reasonable, beneficial and in the public interest before a permit can issue." (*Id.* at p. 8.) Further, "[a]lthough the full conservation yield of the project will be required for future development of the four [Stanislaus River] basin counties, no facilities have been planned up to now to serve project water in these counties and no contracts have been negotiated for such service." (*Ibid.*)

The Board claims that other board precedents show the adequacy of a generalized statement of potential uses of the impounded Delta water. "Similar terms and conditions regarding the place and purpose of use were adopted in [Water Board] Decisions 1629 and 1635, affecting the permits for the Los Vaqueros and El Dorado County projects." (State Wat. Resources Bd., *supra*, Decs. Nos. 1629 (June 2, 1994) [1994 WL267352], 1635 (Oct. 2, 1996) [1996 WL904701].) We find these decisions inapposite. The Board has confused actual uses with potential uses.

In each case the Board issued permits for the construction or use of facilities to improve the service of existing water agencies to their customers for established beneficial purposes. In State Water Resources Board Decision No. 1629, *supra*, the Contra Costa Water District, which supplies water to

400,000 municipal and industrial customers, was issued a permit for a reservoir and diversion facility to "improve the quality of water the District delivers to its customers" and to "improve the reliability of the water supply by providing emergency water storage." (At p. 2.) In Decision No. 1635, *supra*, the Board, inter alia, issued a permit to the County of El Dorado to appropriate water released from the PG&E storage facilities at Lake Aloha, Caples and Silver Lakes into Folsom dam for increased use by its customers in the existing service area for established domestic, municipal and irrigation purposes, subject to appropriate agreements with PG&E. (At p. 101.)

The Water Board also seeks support for multiple potential places of use in the permits issued the DWR in 1967 to appropriate water for storage in the State Water Project dams and facilities for subsequent beneficial uses, described generally as power, domestic, irrigation, municipal and industrial uses, and which identified the place of use as almost 10 million acres "comprising (1) Feather River area, (2) Sacramento-San Joaquin Delta, (3) North Bay area, (4) South Bay area, (5) San Joaquin Valley area, (6) Central Coastal area, and (7) Southern California area . . . ." (State Wat. Resources Bd. Dec. No. D 1275 (May 31, 1967) [1967 WL 6285] p. 3.)

There is no analogy to be drawn. This massive state project, mandated by statute (§ 11125), in furtherance of a general or coordinated plan for development of water resources of the State of California (§ 10500), paid for by bonds secured by "contracts for the sale, delivery or use of water" (§ 12937), pursuant to permits issued the Department (§ 10500),[19] necessarily required a generalized statement of multiple beneficial uses and the designation of a service area encompassing the service area of the project. (See e.g., § 11100 et seq.)

We conclude that DW failed to set forth in its application, and the Water Board failed to determine, the actual intended use or uses of the water to be appropriated for any of the beneficial purposes listed in the Decision and consequently failed to meet the criteria of the Water Code and implementing regulations for determining the reasonable amount of water required for a specific beneficial use.

---

[19] Section 10500 authorizes a filing by the DWR of "applications for any water which in its judgment is or may be required in the development and completion of the whole or any part of a general or coordinated plan looking toward the development, utilization, or conservation of the water resources of the state."

## II

### Permit Conditions Relating to Water Quality and Wheeling

A. *Resolution No. 68-16*

The Decision states as policy that Resolution No. 68-16 is to be followed in any of its water right or water quality actions. It provides in pertinent part: "Whenever the existing quality of water is better than the quality established in policies as of the date on which such policies become effective, such existing high quality will be maintained until it has been demonstrated to the State that any change will be consistent with maximum benefit to the people of the State, will not unreasonably affect present and anticipated beneficial use of such water and will not result in water quality less than that prescribed in the policies."

Appellants claim the Board's failure to investigate the intended use of the appropriated water deprived it of sufficient evidence to determine whether the permits would impact water quality or to determine whether the permits would be consistent with maximum benefit to the people of the state, would not unreasonably affect the present and anticipated beneficial use of any affected water, and would not result in water quality lower than that prescribed in the policies.

The Water Board said it was able to make the required findings because of the settlement agreements DW made with municipal water users who would receive the released water if contracts were entered into. The agreements impose water quality management measures on DW. The municipal water users originally objected to the Project and asserted they would not buy the water because the releases would result in increased treatment costs, but the settlement agreements removed their objections to purchase of the water.

These agreements with potential water users do not satisfy the Water Board's independent duty to resolve the water quality issues and to place appropriate conditions in the permits. The agreements effectively are conditioned upon the sale of water to the parties to the agreement and the obligation is a Board obligation.

However, the Water Board also imposed a condition requiring the Project to meet water quality objectives in water quality control plans. Water quality objectives are part of the water quality control plans adopted by the Water Board or by a regional water quality control board. The objectives establish the levels necessary to protect the beneficial uses of the water covered in the plan. (§§ 13240–13241.)

The appellants claim that without knowing where and in what amounts water will be used, the Board is unable to determine that the appropriated water will be of the same quality as that currently at the location of use. The requirement that the project meet the water quality control plans does not necessarily address that issue.

If the permits are amended to provide the information required by the Water Code the Board will be able to address these issues.

B. *Condition 34b*

 Section 1375 requires the Water Board to find that unappropriated water is available prior to issuing a permit to appropriate water. Appellants claim condition 34b was imposed to ensure water was available for appropriation. They argue the Water Board could not have determined water was available *prior* to the issuance of the permit, if it was necessary to impose a condition that would take effect after the permit was issued. We disagree.

Condition 34b states: "Before filling the DW Project reservoirs above mean sea level, Permittee shall demonstrate to the satisfaction of the Chief, Division of Water Rights, that the water to be developed by the DW Project can reliably be wheeled."

 Wheeling concerns the ability to transfer water by means of aqueducts or other conveyance facilities. The condition concerns the question whether water appropriated from the Delta to DW's reservoirs can be delivered to a would-be purchaser.[20] It differs from the question whether there is water in the Delta available for appropriation, a question the Board has separately decided.

However, condition 34b does permit the construction of the reservoirs and the appropriation of water sufficient to fill them to mean sea level without a showing the water can be wheeled reliably. The conveyance facilities in this case are owned by CVP and SWP and their approval is required before the facilities may be used by DW. (See § 1810 et seq.) Thus condition 34b is in conflict with the condition that no construction be commenced until all necessary federal, state and local approvals have been obtained.

---

[20] The Board said: "In order for the DW project to export water south of the Delta, it must use the export pumping and conveyance facilities of the CVP or the SWP. To sell water for export south of the Delta, the DW Project must secure unused conveyance capacity from the CVP or SWP at the time when a customer wants water. Alternatively, the DW Project could make arrangements with the CVP or SWP to deliver state or federal project water to a DW Project customer in exchange for stored DW Project water, which the CVP or SWP could use at another time to optimize their operations."

DW has not contracted to provide water to a specific customer and consequently has not contracted with the owner of a conveyance facility to provide for delivery to a customer. Accordingly, DW must demonstrate to the Board not only that it has contracted to provide the water to a specific customer but that it has obtained approval for the necessary conveyance facilities.

## III

### Conditions Relating to Levee Stability and Roads

#### A. *Standard of Review*

Appellants argue that because their fundamental, vested rights are affected, the trial court should have exercised its independent judgment on the evidence.

They assert as rights, entitlements to water quality, prevention of seepage which might damage the levees, and prevention of flood risks. The argument is predicated upon the assumption the Project as constructed would present these dangers. It is also predicated upon the assumption the conditions imposed in the permits by the Board exhausted the authority of other agencies which have permit authority over the Project. The appellants have misconceived the Board's authority.

The Board's decision does not permit DW to degrade appellants' water quality or to weaken Delta levees or put neighboring property in danger. It imposes conditions to prevent such harm. It conditions the Project on securing permits from other agencies that have permit authority over the construction of the reservoirs. Any contention the Board's decision will substantially harm appellants' assumed fundamental interests involves speculation. (*Fort Mojave Indian Tribe v. Dept. of Health* (1995) 38 Cal.App.4th 1574, 1591 [45 Cal.Rptr.2d 822].)

We detail the conditions.

#### B. *Levee Stability*

The Water Board found it was not required to conduct a detailed examination of the engineering aspects of the reservoirs because other agencies have the authority to approve dams and levees for the project. The Water Board found that if the maximum possible water storage elevation in the reservoirs

is four or more feet above sea level, the structural safety of the levees will be regulated by the DSOD of the Department of Water Resources. (§ 6004, subd. (c).)

Appellants argue the DSOD will not be involved in the approval of the levees if DW elects not to fill its reservoirs to the planned capacity of four feet above mean sea level. They claim that by failing to adopt conditions to protect the public interest and mitigation measures to avoid the impacts from a levee failure, there was no evidence to support a finding the public and appellants would be adequately protected.

Appellants are incorrect in their claim that by simply electing not to fill the reservoirs to capacity, DW can avoid review of the levies by DSOD. Section 6004, subdivision (c) exempts levees in the Delta from departmental review if the "maximum *possible* water storage elevation" is four feet or more above sea level. (Italics added.) DW cannot escape DSOD review by simply electing not to fill the reservoirs to capacity, if they are constructed to that height.

Even if DW decides in the future to reduce the maximum capacity of the reservoirs to below four feet above sea level and DSOD is not involved in approval of the levees, there is sufficient evidence that the public and appellants would be protected from levee failure.[21] As noted, the permits are conditioned upon securing approval of the appropriate local and other agencies that have permit authority over the Project. Although the Board has the authority to enforce the provisions of a permit by the means specified in the Water Code it does not preempt the enforcement authority of an agency having permit authority over some aspect of the Project.

As a part of the EIR process, an independent analysis of levee stability and seepage issues was performed by URS Greiner Woodward Clyde. This analysis concluded the proposed interceptor well system could operate reliably on a long term basis to control seepage if it were properly designed and maintained. Therefore, the permit is conditioned on DW having the "levees and seepage control system designed and signed off by a licensed professional engineer qualified in the design of levees and seepage control systems in an estuary."

Also, the permits require DW to maintain general liability insurance in the amount of $25 million during the operating life of the Project to protect against damages caused due to the effect of the Project on levee stability,

---

[21] No argument has been tendered concerning the authority of a levee district or districts over the construction of the reservoirs if they are not built to the height which subjects them to the jurisdiction of the DSOD.

seepage, public utilities, and current land uses in the Delta. The policy must be reviewed every three years to determine if the amount of the policy is adequate.

Appellants contend liability insurance is not sufficient to insure against damage caused by the Project because Insurance Code section 533 provides that an insurer is not liable for a loss caused by the willful act of the insured. Appellants reason that this section prevents coverage where the damage is expected. Citing *Smith v. Hughes Aircraft Co.* (1993) 22 F.3d 1432, 1439, appellants claim the appropriate test under Insurance Code section 533 is whether the insured knew or believed its conduct was substantially certain or highly likely to result in harm. Appellants argue the seepage and levee failure damages are expected if the levee system or interceptor well system is not constructed or maintained.

There is no evidence in the record to suggest DW will not construct and maintain the seepage control system or levee system as required by the permits. To the contrary, the permits require that DW implement seepage control measures and to have the levees and seepage control system designed and signed off by a qualified engineer. Moreover, the Water Board retained jurisdiction to impose additional terms as needed for levee design and seepage control systems. This prevents DW from being able to deliberately stop maintaining the levees and interceptor wells without losing the permit.

As an additional measure of protection, the Water Board imposed standard permit terms 48a and K2. Term 48a states if DWR has jurisdiction of the dam as to safety, no construction may be commenced until DWR has approved the plans and specifications. Term K2 provides if the dam is not under the jurisdiction of DSOD, the county engineer, the United States Soil Conservation Service, or a civil engineer registered by the State of California must approve the plans and specifications and direct construction of the dam.

Additionally, the Board noted that DW has entered into an agreement with EBMUD pursuant to which a three-member reservoir island design review board will oversee the design of the levees. The members of the review board must be registered professional civil engineers with experience providing engineering services in the Delta, and at least one member must also be a geotechnical engineer.

Appellants argue the Water Board cannot rely on the settlement agreement between DW and EBMUD to protect against damaging surrounding property because the parties could change the settlement agreement to eliminate the protection provisions.

However, as discussed above, the EBMUD settlement agreement does not provide the only protections against levee failure. Considering the totality of

protections imposed by the permit terms, there is sufficient evidence to support a finding that the Project will not significantly impact surrounding properties.

### C. *Impacts to Bacon Island Road*

Appellants claim they requested mitigation for adverse impacts to Bacon Island Road and its users caused by wind-generated waves from the reservoirs. The record indicates appellants raised this issue in a petition for reconsideration, *after* the Water Board issued its decision. The only other evidence to which appellants cite is a map of the Delta islands showing prevailing wind direction and fetch and two pictures of waves washing ashore. Appellants point to no analysis in the record that the Project is likely to cause wave flooding on Bacon Island Road.

The Water Board found no significant impact to Bacon Island Road would result from the construction and operation of the Project, based on the draft EIR.

Appellants now claim the Water Board improperly relied on counties to address any impact on roads when the Water Board found: "Road maintenance and traffic flow are within the responsibility and jurisdiction of the counties. The counties can and should condition any construction permits issued for the Delta Wetlands Project to mitigate for any adverse effects on Bacon Island Road . . . ."

Appellants' real complaint appears to be that the counties involved are not able, through their permitting process, to prevent flooding of the road from waves washing over it. However, the Water Board concluded this was not a significant impact when it found there were "no significant impacts to [county] roads" and specifically no significant impact to Bacon Island Road due to the construction and operation of the Project.

IV

CEQA Arguments

A. *Evaluation of Impact from Use of Water*

Appellants argue that by failing to evaluate the environmental impacts of the delivery of water to actual purchasers, the Board violated its duty under CEQA to evaluate the impacts of the project and all of its components before approving the project. We agree.

Whenever a public agency proposes to approve a project that may have a significant effect on the environment, it must, with certain exceptions, prepare an EIR. (*Marin Municipal Water Dist. v. K G Land California Corp.* (1991) 235 Cal.App.3d 1652, 1661 [1 Cal.Rptr.2d 767].) Determining whether a project will have a significant environmental effect necessarily involves a certain amount of forecasting, but "sheer speculation" is not required. (*Id.* at p. 1662.)

Thus, section 15145 of the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15145) provides: "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." As long as the agency has thoroughly investigated a particular impact, it may conclude, as the Water Board did here, that the impact is too speculative for evaluation. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1137 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

Even though an agency need not evaluate impacts it considers too speculative, "an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Laurel Heights Improvement Assn. v. Regents* (1988) 47 Cal.3d 376, 396 [253 Cal.Rptr. 426].)

The purpose of an environmental impact statement regarding a project is to provide the agency with discretionary authority over the project with information relevant to the decision it is required to make. In this case

the decision concerns the issuance of permits to appropriate water. Accordingly, the environmental consequences of that decision must be assessed by the Board prior to the issuance of the permits.

The Water Board conducted an investigation and concluded the environmental impacts related to the end use of the Project water was speculative because of the uncertainty over who the end users of the water will be. The environmental effects resulting from the sale of the water are discussed in the EIR in a general fashion, even though a site-specific analysis of the end use was found to be speculative. The final EIR for the Project notes that the draft EIR and revised draft EIR for the Project are based on the assumption there is unmet demand for water in the SWP/CVP service area, and the Project water will be exported using the SWP and CVP facilities.

The final EIR considered the potential uses and places of use of the Project water and found that the environmental effects of using Project water could include growth inducement and expanded agricultural cultivation. Additionally, urban growth and crop cultivation could result in secondary environmental impacts such as loss of vegetation and wildlife habitat and decreased air and water quality. The final EIR states that because the area of delivery and the end uses of the project water are unknown, site specific analysis would be speculative, and the location and amount of any growth is impossible to estimate.

However, pursuant to this opinion, the permits cannot issue until there has been a designation of the end users and the amounts of water that can reasonably serve a specific beneficial use. If and when that is done, the Board may proceed with an analysis of the environmental impacts of the Project relevant to the end user.

If a sale is made to the SWP or CVP and the end users are residential, commercial, or industrial projects in their service areas, such projects would be subject to environmental review by the SWP or CVP that would identify specific impacts resulting from the purchase of the project water. Such review would occur incidental to the permitting decisions that would be required before the Project could be incorporated into SWP, CALFED, or CVP operations, or before DWR, USBR, or CALFED could implement the project.

Accordingly, the CEQA determination is reversed subject to the inclusion of an environmental analysis by the Board when the end users are provided in an amended permits.

B. *Loss of Agricultural Land*

The Water Board approved the Project despite its finding the Project would cause significant loss of agricultural land. The Water Board found the loss of

agricultural land was unavoidable, since maintaining agriculture on the islands was not compatible with the Project.

Appellants claim this finding amounts to a statement of overriding considerations under CEQA. Appellants argue the Water Board could not make such a finding without complying with Guidelines section 15043, which requires that the Board find there is no feasible way to lessen or avoid the significant effect. Appellants claim the final EIR fails to describe any feasible mitigation measures, and that without such description, the Water Board cannot support its conclusion that the impact was unavoidable.

Appellants have waived this argument by failing to exhaust their administrative remedies. CEQA requires that any grounds for noncompliance must be "presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." (Pub. Res. Code, § 21177, subd. (a), hereafter section 21177.) This section requires that a party raise the objection to project approval during the public comment period or prior to the close of the public hearing on the project. (*Federation of Hillside and Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1263 [100 Cal.Rptr.2d 301]; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1120–1121 [71 Cal.Rptr.2d 1] (*Galante Vineyards*).)

The last date of the public comment period for the revised draft EIR was July 31, 2000. The public hearing on the project closed on October 12, 2000. On that date, the Water Board announced at the end of the hearing that it would take the matter under submission. Appellants admit they did not bring the matter to the Board's attention until February 14, 2001, when they faxed a letter to the Board. The Water Board certified the EIR on February 15, 2001, and issued a Notice of Determination on February 16, 2001.

Appellants claim any opposition to the EIR is timely as long as it is presented to the agency prior to certification of the EIR. Appellants' reliance on *Galante Vineyards, supra,* 60 Cal.App.4th 1109, for this proposition is misplaced.

In *Galante Vineyards, supra,* 60 Cal.App.4th 1109, the opponents to the project voiced their concerns at the public hearing on the project, even though they failed to submit those concerns prior to the comment period on the draft EIR. (*Id.* at pp. 1115–1116, 1118.) The water management district argued the objections were not timely because they were submitted after the comment period on the draft EIR, and the subsequent comment period on the final EIR was optional pursuant to CEQA Guidelines. (*Id.* at p. 1118.) The court

disagreed, reasoning that such a reading of section 21177 would ignore that portion of subdivision (a) which states the objection may be presented "prior to the close of the public hearing on the project before the issuance of the notice of determination." (*Id.* at p. 1120.) Holding the appellants had exhausted their administrative remedies, the court stated: "As we read section 21177, any alleged grounds for noncompliance with CEQA provisions may be raised by any person *prior* to the close of the public hearing on the project before the issuance of the notice of determination." (*Id.* at p. 1121, italics added.)

Here, the objections were presented to the Water Board after the public hearing on the project. *Galante Vineyards* does not provide authority for the position that objections are timely if they are submitted after the close of the public comment period, and such an interpretation is contrary to the plain language of the statute.

Appellants have thus waived the issue of the Board's failure to consider mitigation measures for the loss of agricultural land for failure to exhaust their administrative remedies.

Nonetheless, if DW sells the water to a California public agency, it would be necessary for the agency to approve the agreement, and this approval could trigger environmental review of the purchase contract. (See *Deltakeeper v. Oakdale Irrigation Dist.* (2001) 94 Cal.App.4th 1092 [115 Cal.Rptr.2d 244] [EIR prepared in connection with water transfer agreement]; *Friends of Santa Clara River v. Castaic Lake Water Agency* (2002) 95 Cal.App.4th 1373 [116 Cal.Rptr.2d 54] [EIR prepared in connection with sale of water entitlements from one water agency to another].)

Moreover, to the extent any of the appellants have permit authority over the Project they are responsible agencies under the CEQA law. In that event, they must, as a general rule, use the EIR prepared by the lead agency, even if they believe it to be inadequate. (Cal. Code Regs., tit. 14, § 15052.) However, a responsible agency with permit authority does reach its own conclusions as to whether and how to approve the project, notwithstanding the lead agency's approval of the project. (Cal. Code Regs., tit. 14, § 15096(a).)

V

*Section 1392*

Appellants argue the Water Board abused its discretion by approving DW's permits despite DW's expressed intent to sell its appropriated water at a profit in violation of section 1392. Appellants misread section 1392. Section

1392 provides in relevant part that every permittee accepts a permit for the appropriation of water under the condition, "that no value . . . in excess of the actual amount paid to the State therefor shall . . . be . . . claimed for any permit . . . or for any rights granted or acquired under the provisions of this division, in respect to . . . any valuation for purposes of sale to or purchase, whether through condemnation proceedings or otherwise, by the State or any city, city and county, municipal water district, irrigation district, lighting district, or any political subdivision of the State, of the rights and property of any permittee . . . ."

 The plain language of the statute indicates that a permittee may not demand an amount in excess of the actual amount paid for the permit in any sale of the rights and property of the permittee. Appellants claim DW's intent to sell its water to public entities at a profit violates section 1392. However, section 1392 applies to the sale of water rights, not to the sale of the water itself.

Appellants point to no evidence that DW intends to violate section 1392 by selling its permit at an amount greater than the amount actually paid for the permit. Therefore appellants' arguments that the Water Board abused its discretion in granting the permit despite such evidence or in failing to consider the ramifications of section 1392 are meritless.

### DISPOSITION

The judgment is reversed. Costs are awarded to appellants.

Morrison, J., and Hull, J., concurred.

A petition for a rehearing was denied December 16, 2004, and the opinion was modified to read as printed above. The petition of both respondents and real parties in interest for review by the Supreme Court was denied March 16, 2005. Brown, J., did not participate therein.