# United States Court of Appeals for the Federal Circuit

---

**CASITAS MUNICIPAL WATER DISTRICT,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5033

---

Appeal from the United States Court of Federal Claims in No. 05-CV-168, Senior Judge John P. Wiese.

---

Decided: February 27, 2013

---

ROGER J. MARZULLA, Marzulla Law, of Washington, DC, argued for plaintiff-appellant. With him on the brief was NANCIE G. MARZULLA.

KATHERINE J. BARTON, Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was IGNACIA S. MORENO, Assistant Attorney General.

JENNIFER L. SPALETTA, Herum Crabtree, of Stockton, California, for amicus curiae Stockton East Water District.

RODERICK E. WALSTON, of Best Best & Krieger LLP, Walnut Creek, California, for amici curiae Westlands Water District & Sweetwater Company.

CLIFFORD T. LEE, Deputy Attorney General, California Department of Justice, of San Francisco, California, for amicus curiae, California State Water Resources Control Board. With him on the brief were KAMALA D. HARRIS, Attorney General of California, and MARK BRECKLER, Chief Assistant Attorney General. Of counsel on the brief was TARA L. MUELLER, Deputy Attorney General, of Oakland, California.

JOHN D. ECHEVERRIA, Vermont Law School, of South Royalton, Vermont, for amicus curiae Natural Resources Defense Council. Of counsel on the brief was KATHERINE S. POOLE, Natural Resources Defense Council, of San Francisco, California.

———————————

Before NEWMAN, LOURIE, and SCHALL, *Circuit Judges*.

SCHALL, *Circuit Judge*.

Casitas Municipal Water District ("Casitas") operates the Ventura River Project (the "Project"). The Project, which is owned by the U.S. Bureau of Reclamation ("BOR"), provides water to residential, industrial, and agricultural customers in Ventura County, California. Ventura County is located on the southern coast of California, approximately sixty miles northwest of Los Angeles.

On January 26, 2005, Casitas brought suit in the United States Court of Federal Claims, alleging that, by imposing certain operating criteria on the Project, the United States had taken its property without just compensation, in violation of the Fifth Amendment to the Constitution. On December 5, 2011, the Court of Federal

Claims dismissed Casitas's complaint without prejudice, on the ground that Casitas's takings claim was not ripe. In dismissing the complaint, the court held that Casitas's claim was not ripe because Casitas had failed to demonstrate that the operating criteria had as yet caused it to deliver less water to its customers than it otherwise would have delivered. *Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443 (2011) ("*Casitas V*"). Casitas now appeals the dismissal of its complaint. For the reasons set forth below, we *affirm*.

BACKGROUND

I. THE VENTURA RIVER PROJECT

The Project includes Casitas Dam, Casitas Reservoir, the Robles Diversion Dam, and the Robles-Casitas Canal. The Project combines water from Coyote Creek and the Ventura River into Casitas Reservoir, also known as "Lake Casitas." Casitas Reservoir is located on Coyote Creek and is formed by Casitas Dam. Coyote Creek provides approximately sixty percent of the Project's water. The remaining forty percent comes from the nearby Ventura River, which flows through Ventura County to the Pacific Ocean. Water from the Ventura River is diverted by the Robles Diversion Dam into a four-and-a-half-mile-long canal (the Robles-Casitas Canal), which carries water from the Ventura River to Casitas Reservoir. Water from the Reservoir is distributed to Casitas's customers via a conveyance system comprising thirty-four miles of pipeline, five pumping stations, and six balancing reservoirs.

The Project was constructed pursuant to a contract between BOR and Casitas dated March 7, 1956 (the "1956 Contract" or the "Contract"). Under the Contract, BOR agreed to build the Project in exchange for a commitment by Casitas to repay the construction costs over a forty-year period. Casitas also agreed to pay all operating and maintenance costs of the Project. Article 4 of the Contract

states that Casitas "shall have the perpetual right to use all water that becomes available through the construction and operation of the Project." Finally, the Contract requires that Casitas apply to the State of California to appropriate the water for the Project. State water permits were issued to Casitas on May 10, 1956, and the Project was completed and transferred to Casitas for operation in 1959.

Casitas's diversion and use of water for the Project are governed by a license granted to it by the State Water Resources Control Board ("SWRCB" or the "Board"), the state agency responsible for the issuance of permits and licenses for the appropriation of water in California. *See* Cal. Water Code §§ 1225, 1250 (West 2012). The current version of Casitas's license (which is the version in effect at all times pertinent to the case) is dated January 17, 1986 (the "License"). The License provides that Casitas may divert up to 107,800 acre-feet of water per year from the Ventura River and other tributaries and may put up to 28,500 acre-feet of water per year to beneficial use for the Project.

## II. LISTING OF THE WEST COAST STEELHEAD TROUT

In August of 1997, the National Marine Fisheries Service ("NMFS") listed the West Coast steelhead trout as an endangered species under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44. In its final listing, NMFS determined that the primary cause of the decline of the steelhead was "extensive loss of steelhead habitat due to water development, including impassable dams and dewatering." Endangered and Threatened Species: Listing of Several Evolutionary Significant Units (ESUs) of West Coast Steelhead, 62 Fed. Reg. 43,937, 43,949 (Aug. 18, 1997). As a result of the listing, Casitas, its officers, and the BOR faced possible civil and criminal liability under section 9 of the ESA if continued operation of the

Project resulted in harm to the steelhead trout. *See* 16 U.S.C. §§ 1538(a)(1), 1540(a)–(b).

Following the NMFS listing, Casitas explored ways to mitigate the impact of Project operations on the steelhead population. A report by a consulting firm commissioned by Casitas and other local water agencies concluded that "[p]roviding access to habitats upstream of Robles Diversion is one of the most important actions that can be taken to improve steelhead populations in the Ventura River." *Casitas V*, 102 Fed. Cl. at 446–47. The report also stated:

> The best long-term passage can probably be provided by (1) constructing a fish ladder at Robles Diversion, (2) installing a fish collection/bypass facility in the canal, and (3) perhaps maintaining a low flow passage channel . . . to Robles Diversion to assist fish in low flow years.

*Id.* at 447.

Eventually, on March 31, 2003, NMFS issued a biological opinion in which it concluded that construction and operation of a fish ladder at the Robles Diversion Dam would not jeopardize the continued existence of steelhead trout, but might result in incidental take of the fish.[1] The opinion thus included an incidental take statement relieving Casitas (the Project operator) and BOR (the Project owner) of liability under the ESA if the two implemented

---

[1] ESA makes it illegal to "take" any species listed as endangered under the Act. 16 U.S.C. § 1538. "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). An "incidental take" is defined as a take that "result[s] from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." *See* 50 C.F.R. § 402.02; *see also* 16 U.S.C. § 1539(a)(1)(B).

a set of nondiscretionary, reasonable, and prudent measures designed to minimize the incidental take of the steelhead. *See* 16 U.S.C. §§ 1539(a)(1)(B), (a)(2)(A). In addition, the opinion called for a flow regime ("biological opinion operating criteria" or "operating criteria") that would increase the amount of water to be bypassed by Casitas during steelhead migration periods in order to maintain an adequate flow of water in the Ventura River for fish passage to upstream spawning sites. Under protest, Casitas's board of directors passed a resolution implementing the biological opinion operating criteria on April 9, 2003.

Casitas formally opened the Robles fish ladder facility on December 9, 2004. The facility directs steelhead trout moving downstream in the Ventura River into a diversion flume, which then guides the fish into a ladder to prevent them from entering the Robles-Casitas Canal. The ladder also allows steelhead trout moving upstream to pass around the Robles Diversion Dam. *See Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1291 Fig. 2 (Fed. Cir. 2008) (diagram of the fish ladder facility).

### III. CASITAS'S SUIT IN THE COURT OF FEDERAL CLAIMS

On January 26, 2005, Casitas filed suit in the Court of Federal Claims. In its suit, Casitas asserted that, by imposing the biological opinion operating criteria, the United States had breached the 1956 Contract. In the alternative, Casitas asserted that, by imposing the operating criteria, the United States had taken Casitas's property without just compensation, in violation of the Fifth Amendment. Under its contract theory, Casitas sought reimbursement of the approximately $9.5 million that it had spent to build the fish ladder facility. Under its takings theory, it sought compensation for the water it claimed it had lost by the imposition of the operating criteria.

In due course, the government moved for summary judgment on the breach of contract claim and for partial summary judgment on the takings claim. On October 2, 2006, the Court of Federal Claims dismissed Casitas's contract claim. The court ruled that the costs associated with the construction of the fish ladder facility were operation and maintenance costs and thus not reimbursable under the Contract. *Casitas Mun. Water Dist. v. United States*, 72 Fed. Cl. 746, 751 (2006) ("*Casitas I*"). In addition, the court ruled that, even if the government had breached the Contract, the sovereign acts doctrine shielded it from liability. *Id*. at 755.[2]

In a subsequent decision, issued on March 29, 2007, the Court of Federal Claims addressed the government's motion concerning Casitas's takings claim. *Casitas Mun. Water Dist. v. United States*, 76 Fed. Cl. 100 (2007) ("*Casitas II*"). To resolve the takings issue, the government accepted for purposes of its motion Casitas's characterization of its property right. Specifically, the government accepted Casitas's claim that it possessed the right to divert 107,800 acre-feet of water per year from the Ventura River and the right to put 28,500 acre-feet of water to beneficial use each year. For purposes of summary judg-

---

[2]   Under the sovereign acts doctrine, "'the United States[,] when sued as a contractor[,] cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as sovereign.'" *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1574 (Fed. Cir. 1997) (quoting *Horowitz v. United States*, 267 U.S. 458, 461 (1925). The doctrine recognizes that "[t]he two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other." *Yankee Atomic*, 112 F.3d at 1574 (quoting *Jones v. United States,* 1 Ct. Cl. 383, 384 (1865)).

ment, the government challenged only Casitas's claim that diversion of water from the Robles-Casitas Canal constituted a physical taking, arguing that any taking that took place was regulatory in nature. For its part, Casitas conceded that, if the alleged taking were deemed to be regulatory, it could not prevail.[3] In other words, to dispose of the case in the trial court on summary judgment, the parties asked the court to decide only the question of whether a diversion of water from the Robles-Casitas Canal would constitute a physical or a regulatory taking. Ruling for the government, the court held that the alleged taking was regulatory because it involved the government's restraint on Casitas's use of its property rather than the government's takeover of the property (either by physical invasion or by directing the property's use to its own needs). *Casitas II*, 76 Fed. Cl. at 105–06. Based upon the parties' stipulations, it therefore entered summary judgment for the government on Casitas's takings claims and dismissed the complaint. Casitas appealed the dismissal of its complaint to this court.

## IV. THE FIRST APPEAL

On appeal, we affirmed the dismissal of Casitas's breach of contract claim in *Casitas I*. *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1288 (Fed. Cir. 2008) ("*Casitas III*"), *reh'g and reh'g en banc denied*, 556 F.3d 1329 (Fed. Cir. 2009) ("*Casitas IV*"). However, we reversed the dismissal of Casitas's takings claim in *Ca-*

---

[3] Casitas's concession was prompted by the fact that a plaintiff pursuing a regulatory takings claim must demonstrate a significant loss in value relative to the property as a whole. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130-31 (1978). No such limitation exists, however, in the case of a physical taking. *Lorreto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982).

*sitas II* and remanded the case for further proceedings on that claim. *Casitas III*, 543 F.3d at 1296–97.

Addressing the question of whether the alleged taking in this case was physical or regulatory, we noted that the government had admitted, for purposes of summary judgment, that Casitas had a property right in the water diverted from the Ventura River, *Casitas III*, 543 F.3d at 1288, and that the government admitted that it had required Casitas to build the fish ladder facility, *id.* at 1290. We also noted the government's admission that the operation of the fish ladder caused water, which prior to the ladder's construction flowed into Casitas Reservoir via the Robles-Casitas Canal, to be physically diverted away from the canal and into the fish ladder. *Id.* at 1291. Specifically, we noted the government's admission that the operation of the fish ladder includes closing a gate located in the Robles-Casitas Canal, and that the closure of the gate causes water that would have gone into Casitas Reservoir via the Robles-Casitas Canal to be diverted into the fish ladder. *Id.* "These admissions," we stated, "make clear that the government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the Robles-Casitas Canal—after the water had left the Ventura River and was in the Robles-Casitas Canal—and towards the fish ladder, thus reducing Casitas's water supply." *Id.* at 1291–92 (footnote omitted). In conclusion, we held that "[t]he government requirement that Casitas build the fish ladder and divert water to it should be analyzed under the physical takings rubric." *Id.* at 1296. We thus reversed the decision of the Court of Federal Claims in *Casitas II* and remanded the case to the court for further proceedings. We closed the opinion with a footnote stating:

> We have reversed the grant of summary judgment in favor of the government based solely upon our determination that the governmental actions at

issue in this case are properly analyzed under a physical taking rubric. On remand, after receiving the views of the parties and ruling on any matters left open during the summary judgment proceedings, the Court of Federal Claims will be in a position to determine the ultimate question of whether a taking occurred in this case.

*Id.* at 1297 n.17.

The government moved for panel rehearing and rehearing *en banc.* Concurring in the order denying the motions, the *Casitas III* majority explained that, because of the government's concessions, it had not undertaken to decide "if, under California law, there can be a right to divert water." *Casitas IV*, 556 F.3d at 1331 n.1. The panel majority further explained: "Nor did we undertake to reach a conclusion about whether Casitas will experience a reduction in the amount of water that it can beneficially use. These concerns and others are undoubtedly critical to the ultimate outcome of Casitas's action, but they are not before us in this appeal." *Id.*

V. Proceedings on Remand following the First Appeal

On remand, the Court of Federal Claims held a trial on Casitas's takings claim. At the trial, Casitas alleged that the operation of the fish ladder facility at the Robles Diversion Dam had annually deprived it of 3,492 acre-feet of water previously granted it by the State of California. *Casitas V*, 102 Fed. Cl. at 451. Following the trial, the court issued a lengthy opinion in which it held that Casitas's claim was not ripe. *Id.* at 471–72. Accordingly, the court directed the dismissal of Casitas's complaint without prejudice, stating that the complaint could be "refiled (without the payment of additional filing fees) if and when plaintiff's action accrues consistent with this decision." *Id.* at 478.

The court's dismissal was based upon its conclusion as to the scope of Casitas's property right. The government argued that Casitas had neither an absolute, unqualified right to divert a specific quantity of water at all times, nor a possessory right to all of the water it diverted into the Robles-Casitas Canal and stored in Casitas Reservoir. *Id.* at 452–53. Under California law, the government urged, Casitas had a compensable property interest only in the amount of water it put to beneficial use, regardless of the amount of water it may have diverted or stored. *Id.* at 453. According to the government, in order to establish a taking, Casitas had to demonstrate that the specific amount of water actually taken otherwise would have been put to beneficial use. *Id.* For its part, Casitas contended that, under the License, it possessed the right to divert up to 107,800 acre-feet of water annually and that this right was integral to its ability to meet its customers' needs. In Casitas's view, the court was required to focus not on the effect of the operating restrictions on beneficial use of the water, but, rather, on the effect of those restrictions on Casitas's total water supply (including the water stored in the reservoir). *Id.*

The Court of Federal Claims viewed the dispute between the parties as boiling down to one question: "[D]oes California law recognize a right to divert independent of a right to beneficial use?" *Id.* The court answered this question in the negative. First, the court stated that it did not read California law as recognizing a separate, independently compensable right to divert water. *Id.* Instead, the court concluded, "the only compensable right under California water law is a right to beneficial use." *Id.* at 455. Noting that under the License Casitas's water right was "'limited to the amount [of water] actually beneficially used for the stated purposes,'" the court stated that "[t]he holder of an appropriated water right . . . receives nothing more than this right to beneficial use and possesses no legal entitlement to water

that is diverted but never beneficially used." *Id.* at 454–55. Thus, the court held that, in order to succeed on its claim, Casitas had to "demonstrate an interference with . . . beneficial use in order to establish a Fifth Amendment taking of its property." *Id.* at 455.

Addressing the dispute within this framework, the Court of Federal Claims concluded that Casitas's right to "beneficial use [would be] affected when its customers (whether actual or potential) receive less water as a result of the biological opinion operating criteria than they otherwise would have received under the [prior operating] criteria." *Id.* at 470. Because the court found, based upon the record before it, that Casitas had failed to show that the biological opinion operating criteria had thus far resulted in any reduction of water deliveries, it held that Casitas's takings claim was not yet ripe. *Id.* at 471–72. It therefore ordered Casitas's complaint dismissed without prejudice. *Id.* at 478. Casitas now appeals that dismissal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I. FIFTH AMENDMENT TAKINGS

The Fifth Amendment to the Constitution proscribes the taking of private property "for public use, without just compensation." U.S. Const. amend. V, cl. 4. When evaluating whether governmental action constitutes a taking, a court employs a two-part test. First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that interest. *See, e.g., Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1364–65 (Fed. Cir. 2009); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004); *see also Air Pegasus of D.C.,*

*Inc. v. United States*, 424 F.3d 1206, 1212–13 (Fed. Cir. 2005).

"Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (internal quotations and citation omitted); *see also Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (noting that "'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking").

## II. THE POSITIONS OF THE PARTIES

Under the License, Casitas is permitted to divert water from the Ventura River for storage in Casitas Reservoir. *Casitas V*, 102 Fed. Cl. at 446. In that regard, Article X, section 2, of the California Constitution provides as follows: "The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served . . . ." Cal. Const. art. X, § 2. Likewise, under the California Water Code, "[t]he right to the water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served." Cal. Water Code § 100 (West 2012); *see Erickson v. Queen Valley Ranch Co.*, 22 Cal. App. 3d 578, 584 (1971) ("Plaintiff's existing appropriative right is measured not by the flow originally appropriated and not by the capacity of the diversion ditch, but by the amount of water put to beneficial use at the delivery point plus such additional flow as is reasonably necessary to deliver

it."). On appeal, Casitas and the government agree that, under California law, beneficial use is the proper measure of Casitas's property right. *See* Appellant's Br. 39 ("Beneficial use is the measure of the water right, and any water license that purported to authorize diversion of water without a sufficient showing of beneficial use would, in fact, be invalid."); Appellee's Br. 21–22 ("California law recognizes a right not to the use of water *per se* but only to its 'beneficial use.'"). Where Casitas and the government part company is on the question of what, under the facts of this case, beneficial use encompasses.[4]

## A. CASITAS'S POSITION

Preliminarily, Casitas asserts that, in *Casitas V*, the Court of Federal Claims ignored the statement in *Casitas III* that "the governmental actions at issue in this case are properly analyzed under a physical taking rubric," 543 F.3d at 1297 n.17. Casitas states that the court's holding that a taking did not occur when water was diverted away from the canal "cannot be squared with [the alleged holding in *Casitas III*] that the physical taking occurred at the Robles facility, and consisted of the Government's appropriation for public use of water belonging to Casitas." Appellant's Br. 28. Casitas contends that, had the court applied the "physical taking rubric, as instructed" in *Casitas III*, it would have concluded that Casitas had experienced a total water loss of 3,492 acre-feet per year. *Id.* at 27–28. According to Casitas, this loss comprises 1,915 acre-feet to operate the fish ladder and 1,577 acre-feet to operate and maintain the screen in the fish ladder

---

[4]    Stockton East Water District has submitted an amicus brief in support of Casitas, urging reversal of the decision of the Court of Federal Claims. A similar amicus brief has been submitted by the Westlands Water District and Sweetwater Company. The SWRCB and the Natural Resources Defense Council have submitted amicus briefs in support of the government, urging affirmance.

that prevents fish from being swept into the Robles-Casitas Canal. *Id.*

Turning to the concept of beneficial use, Casitas argues that the Court of Federal Claims erred in determining that, in this case, beneficial use does not encompass the right to divert and store annually 107,800 acre-feet of water, the amount set forth in the License. *Id.* at 22. Under California law, Casitas contends, when the SWRCB issued the License, it necessarily determined that Casitas's right to divert and store water is for beneficial use. *Id.* Citing California Water Code § 1610 ("the board shall issue a license which confirms the right to the appropriation of such an amount of water as has been determined to have been applied to beneficial use") and *Central Delta Water Agency v. State Water Resources Control Board,* 124 Cal. App. 4th 245 (2004) (stating at 260 that "[t]he Water Code . . . requires that the applicant set forth and the Board determine the beneficial purpose, place of use, amount of use and method of use to which the appropriated water will be put"), Casitas states: "There can be, quite simply, no variance between the amount one is entitled to divert under a valid California water license and the amount one beneficially uses: They are the same thing." Appellant's Br. 39. Casitas thus reasons that, "[b]y issuing a water license to Casitas, the [Board] . . . has already determined that Casitas can make beneficial use of 107,800 acre-feet of diversions per year," *id.* at 41, and that the License "represents the [Board's] determination that Casitas puts those quantities to beneficial use," *id.* at 43.

Pointing to our determination in *Casitas III* that the government actively caused the diversion of water away from the Robles-Casitas Canal and towards the fish ladder, thus reducing Casitas's water supply, 543 F.3d at 1291–92, Casitas argues that its takings claim has already accrued and is not dependent on some future water loss. That is because, Casitas asserts, when the water

was diverted "Casitas actually, physically lost water that the Government appropriated—a taking of water that is forever gone." Appellant's Br. 52.

Casitas further argues that its claim has accrued even if one accepts the holding of the Court of Federal Claims that a taking would only occur upon there being "an impact on plaintiff's ability to deliver water." *Casitas V*, 102 Fed. Cl. at 473. Appellant's Br. 52–53. Casitas urges that "the facts demonstrate that the biological opinion already reduced Casitas's safe yield—that is, the water that Casitas had available to deliver to its customers—by an average 1,915 acre-feet per year." Appellant's Br. 54. According to Casitas, that is the portion of Casitas's water that entered the fish ladder instead of remaining in the canal to be transported to Casitas Reservoir for later delivery to Casitas's customers. *Id.* Casitas maintains that this safe-yield amount is the amount of water that it must have on hand in order to be able to serve its customers in periods of future drought.[5] *See* Oral Argument at 9:30–10:17, *Casitas Mun. Water Dist. v. United States,* No. 2012-5033 (Fed. Cir. Nov. 6, 2012), *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2012-5033.mp3.

Finally, relying on *Lynch v. United States*, 292 U.S. 571 (1934), and *Lion Raisins*, *Inc. v. United States*, 416 F.3d 1356 (Fed. Cir. 2005), Casitas claims that there was a taking of a contract right, which it argues it possessed under Article 4 of the 1956 Contract. Appellant's Br. 49–50. As noted above, Article 4 of the Contract states that

---

[5]    As noted by the Court of Federal Claims, the term "safe yield" refers to "a commonly used water-planning tool that attempts to limit delivery risk by calculating the amount of water a project can safely deliver to its customers on an annual basis without drawing its reservoir down to a dangerously low level at the end of a critical drought period." *Casitas V*, 102 Fed. Cl. at 462.

Casitas "shall have the perpetual right to use all water that becomes available through the construction and operation of the Project." Casitas contends that, "[b]y appropriating 3,492 acre-feet of Ventura Project water," the government has taken this right of perpetual use. Appellant's Br. 49.

## B. THE GOVERNMENT'S POSITION

The government argues that the Court of Federal Claims did not err in dismissing Casitas's takings claim as unripe. The government contends that, under California water law, private rights in public waters are limited to the right of use and that California law recognizes a right not to water's use *per se*, but only to its beneficial use. Appellee's Br. 23–24. According to the government, the court correctly held that Casitas "must demonstrate an interference with th[e] beneficial use" authorized in the License "in order to establish a Fifth Amendment taking of its property." *Id.* at 26.

Turning to Casitas's principal argument, the government urges us to reject the contention that the License gives Casitas a compensable property right to divert water, even if, as the government sees it, that water is not applied to a beneficial use. The government points to the fact that the License enumerates particular purposes for which the Ventura River's water may be used: "Municipal, Domestic, Irrigation, Industrial, Recreational and Standby Emergency uses." *Id.* at 27. In the government's view, the License then places "an overarching caveat on the scope of the license" when it states that "the amount of water to which this right [of use] is entitled and hereby confirmed is limited to the amount beneficially used for the stated purposes" and when it further limits the right of use by providing that "the amount of water put to beneficial use * * * shall not exceed 28,500 acre-feet per year." *Id.* In addition, the government asserts that, according to its own records, for the 40-year period from

1966 to 2006, Casitas has used, on average, only 17,543 acre-feet of water per year.  *Id.* at 28.

The government also urges us to reject the proposition—advanced by Casitas—that, in granting the License, the Board necessarily determined that Casitas could put to beneficial use 107,800 acre-feet of water per year.  *Id.* The government contends that, since Casitas's license limits it to the beneficial use of 28,500 acre-feet per year, it cannot divert 107,800 acre-feet per year to beneficial use.  *Id.*  It further contends that the 107,800 acre-feet-per-year figure in the License does not represent a guarantee as to beneficial use, but, rather, simply states the maximum amount of water that Casitas may divert per year.  *Id.* at 28–30.  In addition, the government argues that Casitas is incorrect in contending that, in *Casitas III*, we instructed the Court of Federal Claims to proceed on remand on the basis that Casitas has a property interest in the diversion of water.  *Id.* at 33–34.  In the government's view, *Casitas III* left open the critical question of the scope of Casitas's property interest, as evidenced by the panel majority's concurrence in the denial of rehearing and rehearing *en banc* in *Casitas IV*.  *Id.* at 35–37. The government thus urges us to affirm the dismissal of Casitas's takings claim as unripe on the ground that there has been no interference with Casitas's right under the License to beneficial use of diverted water.

As to actual accrual of the takings claim, the government argues that, in situations where governmental action and impingement on a compensable property interest are not coincident, a takings claim does not accrue until damages are apparent.  *Id.* at 50–51.  The government also argues that, under a physical takings rubric, a compensable taking "will not accrue unless and until Casitas experiences a compensable harm in the form of the loss of the beneficial use of water."  *Id.* at 58.  The government contends that the trial court's finding that up to this point there has been no encroachment on Casitas's

right to beneficial use is supported by the record. *Id.* at 41–49.

Lastly, the government asserts that Casitas has waived its argument that it has suffered a taking of a contractual right, by failing to raise the argument prior to this appeal. *Id.* at 37.

## III. ANALYSIS

### A. STANDARD OF REVIEW

This court reviews legal conclusions by the Court of Federal Claims *de novo* and factual findings for clear error. *Estate of Hage v. United States*, 687 F.3d 1281, 1285 (Fed. Cir. 2012). The nature or scope of a compensable property interest in a takings analysis is a question of law. *Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005). In addition, whether the Court of Federal Claims properly dismissed a complaint for lack of subject matter jurisdiction also is a question of law. *Howard W. Heck and Assocs., Inc. v. United States*, 134 F.3d 1468, 1471 (Fed. Cir. 1998) (citing *Wheeler v. United States*, 11 F.3d 156, 158 (Fed. Cir. 1993)). Finally, the Court of Federal Claims must address ripeness as a "threshold consideration[]" before addressing the merits. *See Palazzola v. Rhode Island*, 533 U.S. 606, 618 (2001).

### B. APPLYING THE PHYSICAL TAKINGS RUBRIC

We first address Casitas's argument that the Court of Federal Claims did not follow this court's prior holding that, on remand after the first appeal, "[t]he government requirement that Casitas build the fish ladder and divert water to it should be analyzed under the physical takings rubric." *Casitas III*, 543 F.3d at 1296. As part of its argument, Casitas repeatedly asserts that, in *Casitas III*, we held that a taking had, in fact, already occurred based on the diversion of water down the fish ladder:

> So the trial court's contrary holding that "the tak-
> ings claim does not accrue when the water is ac-
> tually diverted," and that Casitas's claim is
> therefore not ripe, cannot be squared with *this
> Court's holding that the physical taking occurred*
> at the Robles facility, and consisted of the Gov-
> ernment's appropriation for a public use of water
> belonging to Casitas.

Appellant's Br. 28 (emphasis added); *see also id.* at 22
("For what was taken in this case (as this Court held) was
a specific quantity of water that Casitas was entitled to
divert and store in its reservoir under the terms of its
License."); *id.* at 27 ("This Court carefully explained that
the taking consists of the Government-required diversion
of water out of the Robles-Casitas canal and into the fish
ladder—an appropriation of Casitas's water for a public
use . . . ."); *id.* at 36 ("The fact is that (as this Court held)
the physical appropriation of water belonging to Casitas
began when the fish ladder went into operation in 2005,
and the location of the taking was the Robles facility.").
In support of its argument, Casitas highlights statements
from this court's prior opinions that water diverted into
the canal "has become the property of Casitas" and that
"[t]he operation of the fish ladder diversion works thus
takes the property of Casitas." *Id.* at 28 (quoting *Casitas
IV*, 556 F.3d at 1332); *see also* Appellant's Br. 36–37
(quoting *Casitas III*, 543 F.3d at 1296, 1294, 1291). In
essence, Casitas argues that, in the first appeal, this court
determined that the diversion amounted to a physical
taking, and that the Court of Federal Claims thus erred
in not finding in Casitas's favor on its takings claim on
remand.

Casitas's argument fails, however, because it reads
too broadly from our prior opinions. Any statements in
*Casitas III* or *Casitas IV* addressing the scope of Casitas's
property interest in the diverted water must be read in
light of (1) the government's temporary concessions for

purposes of summary judgment and *Casitas III's* review of the grant of summary judgment based upon those concessions; and (2) the narrowness of the issue actually addressed in *Casitas III*. We discuss these points in turn.

First, as noted above, in order to put the case in a posture for summary judgment, the government made certain temporary concessions regarding the scope of Casitas's property interest. *Casitas III*, 543 F.3d at 1297 n.17 ("[T]he government made certain conditional concessions in order to put the case in a posture for summary judgment."); *Casitas V*, 102 Fed. Cl. at 450 ("[D]efendant filed a summary judgment motion in which it accepted, for the purposes of the motion, plaintiff's characterization of its property right."). Specifically, the government conditionally accepted Casitas's assertion that it had a right to divert up to 107,800 acre-feet of water per year and may put up to 28,500 acre-feet of water per year to beneficial use. *Casitas III*, 543 F.3d at 1288. Since they were integral to the Court of Federal Claims's decision in *Casitas II*, this court relied on those concessions throughout the first appeal. *Casitas III*, 543 F.3d at 1288; *Casitas IV*, 556 F.3d at 1331. The government's concessions (and this court's reliance on those concessions) only persisted, however, through the first appeal. *See Begnaud v. White*, 170 F.3d 323, 327 (6th Cir. 1948) (noting that concessions made solely for the purposes of summary judgment are "no longer effective" if the motion is denied). We thus find misplaced Casitas's reliance on statements from *Casitas III* and *Casitas IV* based on the government's concessions for purposes of summary judgment.

The narrowness of the issues addressed in the first appeal also undercuts Casitas's position. Prior to the instant appeal, this court has neither substantively considered the scope of Casitas's rights in the diverted water nor addressed whether a taking actually occurred. *Casitas IV*, 556 F.3d at 1331 n.1 ("Because of the government's concessions, the majority did not undertake to

decide if, under California Law, there can be a right to divert water."); *Casitas III*, 543 F.3d at 1297 n.17 ("On remand, . . . the Court of Federal Claims will be in a position to determine the ultimate question of whether a taking occurred in this case."). Instead, as acknowledged by Casitas, the only currently relevant issue before this court in the first appeal was the trial court's determination, at summary judgment, that a regulatory takings analysis rather than a physical takings analysis should apply to Casitas's claim. Appellant's Br. 20 ("In fact, the entire reason behind the first appeal was to determine whether a physical or regulatory takings analysis applied."); *see Casitas III*, 543 F.3d at 1288–97. The precise scope of Casitas's property right was, in fact, not addressed until the trial leading to the opinion now on appeal. *Casitas V*, 102 Fed. Cl. at 445 n.2 ("Although an examination of the nature of a claimant's property interest is generally a threshold inquiry in a takings case, that issue was not addressed as part of the earlier proceedings before this court.").

For these reasons, any statements in *Casitas III* or *Casitas IV* seeming to characterize Casitas's property right or an alleged taking in no way bound the Court of Federal Claims on remand, because those statements were either based explicitly and solely on the government's now-obsolete concessions or related to issues not actually addressed in the first appeal. *See Begnaud*, 170 F.3d at 327; *Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1306 (Fed. Cir. 2007) (noting that the Court of Federal Claims is not bound by statements "unnecessary to the decision in the case"). Thus, on remand, the Court of Federal Claims was correct to perform a full physical takings analysis, beginning with an assessment of the scope of Casitas's right to the diverted water. *See, e.g., Palmyra Pac. Seafoods*, 561 F.3d at 1364–65. We now address that assessment.

C. THE SCOPE OF CASITAS'S PROPERTY INTEREST—

CALIFORNIA LAW

In the opinion currently on appeal, the Court of Federal Claims held that "the only compensable right under California water law is a right to beneficial use" and that "[t]he holder of an appropriated water right, in other words, receives nothing more than this right to beneficial use and possesses no legal entitlement to water that is diverted but never beneficially used." *Casitas V*, 102 Fed. Cl. at 455. We agree with that holding and with the court's assessment of the scope of Casitas's rights.

Under well-established California law, "the right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use." *Eddy v. Simpson*, 3 Cal. 249, 252 (1853), *quoted in United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 100 (Cal. Ct. App. 1986). In other words, a party having a right to use a given amount of California surface water does not have a possessory property interest in the corpus or molecules of the water itself. *See People v. Shirokow*, 26 Cal. 3d 301, 307 (1980) ("Both riparian and appropriative rights are usufructuary only and confer no right of private ownership in the watercourse."); *Kidd v. Laird*, 15 Cal. 161, 180 (1860) (stating that a right to use "carries with it no specific property in the water itself"); *Allegretti & Co. v. Cnty. of Imperial*, 138 Cal. App. 4th 1261, 1271 n.5 (Cal. Ct. App. 2006) ("Water rights carry no specific property right to or in the corpus of any water."); *Cent. and W. Basin Water Replenishment Dist. v. S. Cal. Water Co.*, 109 Cal. App. 4th 891, 905 (Cal. Ct. App. 2003) ("Water rights holders have the right to take and use water but they do not own the water and cannot waste it.") (internal quotations omitted). The California Water Code reflects this view, clarifying that it should not be "construed as giving or confirming any right, title, or

interest to or in the corpus of any water." Cal. Water Code § 1001 (West 2012).

Despite this preclusion on a private entity's ownership of the corpus of water itself, appropriative water rights (such as those at issue here) have long been recognized by California courts as private property subject to ownership and disposition. *Thayer v. Cal. Dev. Co.*, 164 Cal. 117, 125 (1912) ("Under the law of this state as established at the beginning, the water-right which a person gains by diversion from a stream for a beneficial use is a private right, a right subject to ownership and disposition by him, as in the case of other private property."); Wells A. Hutchins, *The California Law of Water Rights* 120–21 (1956); *see also State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 100 (Cal. Ct. App. 1986) ("It is equally axiomatic that once rights to use water are acquired, they become vested property rights. As such, they cannot be infringed by others or taken by government action without due process and just compensation."). In other words, although a private entity cannot own water itself, the right to use that water is considered private property. The California Water Code reflects this legal framework and describes appropriative rights as being "acquired." Cal. Water Code § 102 (West 2012) ("All water within the State is the property of the people of the State, but the right to the use of water *may be acquired* by appropriation in the manner provided by law.") (emphasis added).

Although appropriative rights are viewed as property under California law, those rights are limited to the "beneficial use" of the water involved. *See Hufford v. Dye*, 162 Cal. 147, 153 (1912) ("It is the well-settled law of this state that one making an appropriation of the waters of a stream acquires no title to the waters but only a right to their beneficial use and only to the extent that they are employed for that purpose."). This principle, set forth explicitly in the California Constitution, limits water

rights holders to the use of the amount of water "reasonably required for the beneficial use to be served . . . ." Cal. Const. art. X, § 2. The same limitation is found in the California Water Code. *See* Cal. Water Code § 100 (West 2012) (adopting the constitutional language related to beneficial use); *id.* § 1240 (limiting appropriations to "some useful or beneficial purpose"). California courts have found the beneficial use limitation a valid exercise of state power to regulate water rights for public benefit and have deemed it an "overriding constitutional limitation" on those rights. *State Water Res. Control Bd.*, 182 Cal. App. 3d at 105–06.

### D. THE SCOPE OF CASITAS'S PROPERTY INTEREST— ANALYSIS

With that background, we now turn to the scope of Casitas's property interest, addressing first Casitas's argument that the License demonstrates that the SWRCB determined Casitas can make beneficial use of, and thus has a potentially compensable property right in, 107,800 acre-feet of water per year. Appellant's Br. 38–48. Casitas relies on *Central Delta Water Agency v. State Water Resources Control Board*, 124 Cal. App. 4th 245 (Cal. Ct. App. 2004), to argue that, because the Board is the entity that determines "the estimated amount which can be put to beneficial use," "[b]y issuing a water license to Casitas, the [Board] . . . has already determined that Casitas can make beneficial use of 107,800 acre-feet of diversions per year." Appellant's Br. 41.

In *Central Delta*, various parties challenged a decision of the SWRCB issuing permits for the appropriation of water for a wetlands project and certifying a final environmental impact report for the project. *Central Delta*, 124 Cal. App. 4th at 252. In so doing, the parties argued that the Board's decision was defective because the permits, which allowed the impoundment of water in a reservoir, failed to identify any actual beneficial use (or

estimated amounts of beneficial use) for the impounded water. *Id.* at 253. Agreeing, the appeals court found that the Board's general statement of potential use did not satisfy its statutory and constitutional obligations to determine "that an actual, intended beneficial use, in estimated amounts [would] be made of the impounded waters." *Id.* The court therefore reversed the decision of the trial court sustaining the Board's decision and ordered the court to set aside the permits and to direct the Board to require amendment of the permit applications. *Id.*

In this case, in the License, the Board set a limit of 107,800 acre-feet per year on the total amount of water to be diverted by Casitas. At the same time, it limited the amount of water that could be put to beneficial use to 28,500 acre-feet per year, thereby satisfying the requirements set forth in *Central Delta*. It is the License's diversion limitation—set at 107,800 acre-feet per year—that Casitas seeks to change from a limitation to a right, i.e., a right to beneficial use. *Central Delta*, however, does not stand for the proposition that the presence of a maximum diversion amount in a water license demonstrates that the Board has determined that that maximum amount can be applied to beneficial use. In addition, here the Board expressly limited the amount "placed to beneficial use" at only 28,500 acre-feet per year.[6] *Central Delta* does not help Casitas.

---

[6]    Framing this argument slightly differently, Casitas asserts that "[t]here can be, quite simply, no variance between the amount one is entitled to divert under a valid California water license and the amount one beneficially uses: They are the same thing." Appellant's Br. 39. In essence, Casitas argues that two alleged predicates— (1) the License gives Casitas a right to divert 107,800 acre-feet of water per year and (2) in a valid license, rights are limited to beneficial use—lead to a conclusion that Casitas's alleged right to divert 107,800 acre-feet of

We now turn to the question of whether the storage of water or diversion to storage of water, in and of themselves, constitute beneficial uses. We conclude that they do not. The Court of Federal Claims correctly determined that the state of California does not categorize storage or diversion for storage, in and of themselves, as beneficial uses. *See Lindblom v. Round Valley Water Co.*, 178 Cal. 450, 456 (1918) ("Storage of water in a reservoir is not in itself a beneficial use. It is a mere means to the end of applying the water to such use."); *see also Bazet v. Nugget Bar Placers*, 211 Cal. 607, 618 (1931) (same). The language of the License supports this interpretation of the beneficial use limitation, clearly identifying only "withdrawal from storage"—in contrast to "collection to storage"—as a beneficial use. J.A. 7781.

Casitas relies on *Meridian v. City and County of San Francisco*, 13 Cal. 2d 424, 449 (1939), for that case's statement that "the storage of water for the purposes of flood control, equalization and stabilization of flow and *future use*, is included within the beneficial uses to which the waters of the rivers and streams of the state may be put" under the doctrine of beneficial use. Appellant's Rep. Br. 15–16 (emphasis added). In *Meridian*, the California Supreme Court denied a downstream landowner's request to enjoin the upstream governmental entities' proposed increase in storage because "the water allotted to the plaintiff by the trial court is abundantly sufficient in amount to supply all of its needs and . . . no substantial damage to its land has in that respect resulted by reason of the city's storage." *Meridian*, 13 Cal. 2d at 451. The

---

water per year must therefore be for beneficial use. This argument fails, however, because diversion and beneficial use are not the same thing and because the License clearly entitled Casitas only to the amount "placed to beneficial use," an amount limited to 28,500 acre-feet per year.

issue in *Meridian* was whether the state had the right to divert to storage water "in excess of the present and future needs" of downstream appropriators. *Id.* at 444. The court found that when such an excess exists, "it is for the state to say whether, in the conservation of this natural resource in the interest of the public, the diversion is excessive." *Id.* at 450. Thus, Meridian stands for the narrow proposition that government diversion of excess water for storage is not improper when holders of downstream rights are not affected. *Meridian* does not, however, stand for the broader proposition asserted by Casitas—i.e., that an appropriative rights holder's diversion to storage of water that *may* be put to "future use" necessarily amounts to a beneficial use, in and of itself.

In addition to seeking to expand its limit on beneficial use from 28,500 acre-feet per year to 107,800 acre-feet per year, Casitas asserts that its compensable property right is not limited to water put to beneficial use. *See* Appellant's Rep. Br. 5 ("[T]he Government cannot prevent Casitas from accessing water it was entitled to divert under its California permit without paying just compensation."); *see also id.* at 6–7; Appellant's Br. 44–48. We find this argument unpersuasive. Pertinent sections of the California Water Code, relevant case law, and the language of the License itself demonstrate that the water rights conveyed to Casitas in the License were limited to the water beneficially used.

Section 1240 of the California Water Code states that "[t]he appropriation must be for some useful and beneficial purpose, and when the appropriator or his successor in interest ceases to use it for such purpose the right ceases." Cal. Water Code § 1240 (West 2012). Section 1627 of the Water Code similarly limits an appropriative rights holder, stating that "[a] license shall be effective for such time as the water actually appropriated under it is used for a useful and beneficial purpose in conformity with this division *but no longer*." *Id.* § 1627 (emphasis

added); *see also id.* § 1390 (stating a similar limitation for "permits"). The License includes language from § 1627, J.A. 7783, and also states that "the amount of water to which this right is entitled and hereby confirmed is *limited to the amount actually beneficially used* for the stated purposes" of "Municipal, Domestic, Irrigation, Industrial, Recreational and Standby Emergency uses." J.A. 7781 (emphasis added). The License then explicitly limits "[t]he total amount of water to be placed to beneficial use" to 28,500 acre-feet per year. *Id.*

As discussed above, under California law, the concept of beneficial use provides an "overriding constitutional limitation" on a party's water rights. *State Water Res. Control Bd.*, 182 Cal. App. 3d at 105. In addition, the California Supreme Court has stated that an appropriative rights holder is entitled only to the amount of water beneficially used, not necessarily the entire amount diverted:

> The quantity of water to which a person becomes entitled by such diversion is not determined by the capacity of the ditch diverting the water; the extent of the right gained by the diversion is limited to the amount of water applied to a beneficial use, which has been interpreted to mean the amount actually used and reasonably necessary for a useful purpose to which the water has been applied.

*Haight v. Costanich*, 184 Cal. 426, 431 (1920). It is the holder's rights (as limited by beneficial use) that represent the property interest subject to a potential government taking. *State Water Res. Control Bd.*, 182 Cal. App. 3d at 100. Based upon this authority, we agree with the Court of Federal Claims's holding that "the only compensable right under California water law is a right to beneficial use." *Casitas V*, 102 Fed. Cl. at 455.

The cases cited by Casitas do not undermine this conclusion. Contrary to Casitas's argument, Appellant's Rep. Br. 5–6, *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950), did not remove the beneficial use limitation to California water rights. Instead, that opinion explicitly noted that the beneficial use limitation, as stated in the California Constitution, "is not transgressed by the awards in question which only compensate for the loss of actual beneficial use." *Gerlach*, 339 U.S. at 751–52. At issue in *Gerlach* was whether the government's action preventing spill over from Friant Dam from reaching the claimants' land amounted to "waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." *Id.* at 730, 752. If the prior spill over had been deemed "waste," the claimants could not have received compensation for its loss. *Id.* at 752. Because the spill over would have benefited claimants' land, however, the Supreme Court found it was not waste but beneficial, and therefore compensable. *Id.* at 752–55. Thus, *Gerlach* stands for the same proposition stated by the Court of Federal Claims—that "the only compensable right under California water law is a right to beneficial use." *Casitas V*, 102 Fed. Cl. at 455.

This court's recent decision in *Estate of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012), also does not support Casitas's argument. Casitas relies on general language from that decision noting that "the government could not prevent [claimants] from accessing water to which they owned rights without just compensation." Appellant's Rep. Br. 13–14. The outcome of the case, however, contradicts Casitas's argument. In *Estate of Hage*, this court found no physical taking had occurred because, applying a beneficial use limitation under Nevada law similar to the one at issue here, the court determined that the claimants could not show "that the government actually took water that they could have put to beneficial use." *Estate of Hage*, 687 F.3d at 1290.

Thus, *Estate of Hage* further confirms that under a beneficial use limitation, such as that applied under California law, compensable water rights are limited to water beneficially used.

We have considered and find unpersuasive Casitas's additional arguments on this issue. For these reasons, we agree with the Court of Federal Claim's holdings regarding the scope of Casitas's property interest. *Casitas V*, 102 Fed. Cl. at 455.

### E. ACCRUAL OF CASITAS'S TAKINGS CLAIM

We now address the trial court's determination that Casitas's takings claim has not accrued and will not accrue until Casitas can demonstrate that the biological opinion operating criteria have caused Casitas to deliver to its customers less water than it otherwise would have delivered. *Casitas V*, 102 Fed. Cl. at 470–74. As noted above, the second step in a takings analysis is to assess whether governmental action amounted to a compensable taking of the identified property interest. *See, e.g., Palmyra Pac. Seafoods*, 561 F.3d at 1364–65. For the reasons discussed below, we conclude that the Court of Federal Claims did not err in finding that the diversion of the required amount of water down the fish ladder does not currently impinge on Casitas's compensable property interest—the right to beneficial use.

The Court of Federal Claims determined that Casitas "can establish a compensable injury when . . . diversions resulting from the biological opinion criteria reduce the water project's safe yield to the point when deliveries are affected—i.e., to the point when use becomes constrained." *Casitas V*, 102 Fed. Cl. at 473. Casitas asserts that "even accepting the trial Court's theory that the taking occurs when there is an 'impact on plaintiff's ability to deliver water,' Casitas's claim is ripe." Appellant's Br. 52–53; *see also id.* at 54–55. Casitas fails, however, to identify any way that "deliveries are affected." *See Casitas V*, 102 Fed.

Cl. at 473.  In other words, Casitas fails to demonstrate as clearly erroneous the "evidence before the court . . . that there has been no encroachment on plaintiff's beneficial use to date."  *See id.* at 470 (listing various factual findings indicating that no encroachment has yet occurred).

Next, Casitas challenges the trial court's test for potential injury by asserting that the court "misapplied this Court's accrual cases, which make clear that the triggering event for accrual (and statute of limitations) is the governmental action that gives rise to the claim, and not the damage that subsequently results."  Appellant's Br. 53.  Casitas argues that the issuance of the biological opinion in 2003 was the "sovereign act" that marked the accrual of Casitas's takings claim, making future attempts to assert its claim after dismissal potentially barred by the statute of limitations.  *Id.*  We disagree that the court misapplied the relevant precedent in holding that "there is no injury—and thus no accrual of plaintiff's taking claim—until plaintiff suffers an actual reduction in beneficial use."  *Casitas V*, 102 Fed. Cl. at 474.  In our view, a compensable injury could not have occurred because the act constituting a taking has not yet occurred.

"The Tucker Act, 28 U.S.C. §1491(a)(1), provides the Court of Federal Claims with jurisdiction over takings claims brought against the United States."  *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006), *aff'd* 552 U.S. 130 (2008).  "Pursuant to 28 U.S.C. § 2501, claims brought in the Court of Federal Claims under the Tucker Act are 'barred unless the petition thereon is filed within six years after such claim first accrues.'"  *Id.*  A claim under the Tucker Act, including takings claims, "first accrues" "only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988).  The act that causes accrual of a physical taking claim is the

act that constitutes the taking. *See Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) ("[A] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs.").

Casitas's argument fails because it misidentifies the issuance of the biological opinion as the act causing accrual of its claim. As made clear in this court's opinion in *Casitas III*, however, any taking in this case would be physical, not regulatory in nature. *Casitas III*, 543 F.3d at 1296 ("The character of the government action was a physical diversion for a public use—the protection of an endangered species. The government-caused diversion to the fish ladder has permanently taken that water away from Casitas."). Further, as noted above, the only diversion relevant to the takings claim would be a diversion that impinges on Casitas's right to beneficial use. No such diversion has yet occurred. *Casitas V*, 102 Fed. Cl. at 470–74. It is this potential future diversion of water (i.e., a diversion that impinges on Casitas's right to beneficial use) that, if and when it occurs, will begin the cascade of "events which fix the government's alleged liability" under *Hopland Band*. Because the act constituting a taking has not yet occurred, Casitas's takings claim has not yet accrued. *See Ingrum*, 560 F.3d at 1314.[7]

Casitas relies on *Estate of Hage v. United States*, *supra*. In that case, the Hages filed a complaint in the Court of Federal Claims in 1991, alleging a physical taking of water rights based on the construction of fences around water sources on federal lands in which they held

---

[7] In the language of the cases relied on by Casitas, because there has not yet been any "government action" constituting a taking, there cannot be any damages, let alone those "complete and fully calculable." Appellant's Br. 55 (quoting *Goodrich v. United States*, 434 F.3d 1329, 1336 (Fed. Cir. 2006), and *Fallini v. United States*, 56 F.3d 1378, 1382 (Fed. Cir. 1995), respectively).

grazing permits. *Estate of Hage*, 687 F.3d at 1288–89. The government had erected fences in 1981–82 and again in 1988–90. *Id.* at 1289. The Court of Federal Claims held that the construction of the fences amounted to a physical taking, but did not specify which fences—those erected in 1981–82, those built in 1988–90, or all—constituted the taking. *Id.* This court dismissed as time-barred any takings claim based on fences erected in 1981–82, more than six years prior to the filing of the complaint. *Id.*

Casitas argues that this application of the accrual rule is proper, but that this rule would render its claim time-barred if dismissed and later refiled. *See* Appellant's Rep. Br. 26. *Estate of Hage* does not, however, set forth a rule that would preclude Casitas's claim if refiled after an alleged taking has actually occurred. In *Estate of Hage*, this court found any takings claim based on the fences erected in 1981–82 time-barred because the construction of those fences constituted the physical act causing accrual of any portion of the takings claim related to those fences. *Estate of Hage*, 687 F.3d at 1289. In contrast, here, a diversion constituting a physical taking—i.e., one impinging on Casitas's right to beneficial use—has not yet occurred and may never occur. A takings claim based on an act that has yet to occur cannot be time-barred.

In conclusion, we hold that the Court of Federal Claims properly found that the diversion of water down the fish ladder to date has not impinged on Casitas's compensable property interest—the right to beneficial use. If and when Casitas has sufficient evidence to file a complaint alleging a compensable injury, Casitas's takings claims will have accrued.

### F. CASITAS'S CONTACT-BASED TAKINGS ARGUMENT

We need not address the substance of Casitas's contract-based takings argument because we agree with the government that Casitas failed to raise the argument

until this appeal. *See San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1354–55 (Fed. Cir. 2011) ("Because the Tribe did not raise this argument before the Court of Federal Claims, it is waived on appeal."). Neither Casitas's proposed conclusions of law, J.A. 1880–81, nor its post-trial briefs, J.A. 11253 ¶ 22 & J.A. 11355 ¶ 22, actually set forth its current argument—that the Contract was a property interest subject to a contract-based taking. The post-trial briefs merely recite Article 4 of the 1956 Contract in a block quote. The proposed conclusions of law provide little more, adding only a quote from this court's opinion in *Casitas III*, noting that Article 4 "constitutes a promise by the United States that Casitas shall have the perpetual right to water made available by the construction and operation of the Project . . . ." J.A. 1880–81 (quoting *Casitas III*, 543 F.3d at 1286).

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Federal Claims dismissing Casitas's complaint without prejudice.

## **AFFIRMED**

### COSTS

Each party shall bear its own costs.